**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

RUTH SAMUEL, as the Personal Representative )
of the Estate of Nathan Samuel, deceased, )
          )
    Plaintiff,     )
          )
v.            )  Case No. 10-CV-683-GKF-TLW
          )
CITY OF BROKEN ARROW, Oklahoma, a )
municipal corporation, and STEPHEN GARRETT, )
an individual,       )
          )
    Defendants.   )

## OPINION AND ORDER

This matter comes before the court on the Motion for Summary Judgment (Dkt. #26) of defendant City of Broken Arrow, Oklahoma ("City") and the Motion for Summary Judgment (Dkt. #44) of defendant Stephen Garrett ("Officer Garrett"). The court heard oral arguments on the motions on November 17, 2011. The motions are evaluated separately.

## I. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that a motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Adler v. Wal-Mart Stores, Inc.*, 144 F3d 664, 670 (10th Cir. 1998). A court must

examine the factual record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995).

When the moving party has carried its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (citations omitted). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler*, 144 F.3d at 670. In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## II. Undisputed Material Facts

On October 6, 2009, Officer Garrett was on duty as a patrol officer with the City of Broken Arrow Police Department. At approximately 11:45 p.m., he was dispatched as the backing officer on a domestic violence call. Officer Garrett was told that a man and woman were physically fighting and the female was screaming for help. The 911 call came from a next-door neighbor, Jimmy Franklin. Officer Garrett was only a mile away and was the first officer to arrive on the scene. As he drove up, he used his spotlight to illuminate the house numbers and saw a man, later identified as Nathan Samuel, and a woman, later identified as Ruth Samuel, standing by a car in the driveway and near the garage door. As the officer exited his vehicle, he observed Mr. Samuel walk quickly to the front door.

Jimmy Franklin says that shortly before Officer Garrett arrived on the scene, he overheard Mr. Samuel tell Mrs. Samuel that "he wasn't going to go to jail, either they were going to have to shoot him or whatever." (Dkt. #26-5, p.2). Officer Garrett was unaware of the statement, so it did not inform his decision to use deadly force. However, as evidenced by the following undisputed facts, Mr. Samuel's observable actions were consistent with the statement Franklin overheard.

When Mr. Samuel reached the front door, which was locked, he kicked it open. Officer Garrett approached Mrs. Samuel, who had stepped off the driveway and into the front yard. Mrs. Samuel told Officer Garrett that everything was fine. Officer Garrett heard what he discerned to be a utensil drawer rattling inside the residence. He asked Mrs. Samuel if there were any weapons in the residence; Mrs. Samuel stated "he is getting a knife." (Dkt. #26, pp. 8-9, City's Statement of Undisputed Material Facts, ¶ 12, Dkt. #26-4, p. 39 at ¶ 8; Dkt. #39, pp. 2-3, Plaintiff's Response at ¶ 12; Dkt. #51, p. 7 at ¶ 31).[1] Officer Garrett then drew his service weapon. (Dkt. #26, p. 9 at ¶ 13; Dkt. #44, p 15 at ¶ 31; Dkt. #39, p. 3 at ¶¶ 12-13). Mr. Samuel stepped through the front door and came to a stop. His hands were raised to approximately shoulder level, and in his right hand he held a knife pointed at Officer Garrett. The knife was approximately 10 inches from hilt to tip, with a 5 inch blade. Officer Garrett directed Mrs. Samuel away from the front door toward the garage and vehicles in the driveway.

---

[1] In her response to the City's motion for summary judgment, the plaintiff does not contest, and affirmatively states, that Mrs. Samuel said "he's either got a knife" or "is getting a knife." Dkt. #39, p. 3 at ¶12. Compare plaintiff's response to Officer Garrett's motion for summary judgment, where the plaintiff "denied telling Officer Garrett that her husband had a knife." *See* Dkt. #51, p.3, ¶15 and p. 7, ¶ 31; Dkt. #51-3, p.16, lines 1-7.

Officer Garrett commanded Mr. Samuel to drop the knife, and stated on his police radio "[h]e's got a knife, step it up." Mr. Samuel took two more steps forward.[2] Officer Garrett again ordered Mr. Samuel to drop the knife, but Mr. Samuel ignored the command.

A dispute exists as to the distance between the officer and Mr. Samuel. Officer Garrett perceived the distance to be 10-15 feet (Dkt. #44-1, p.22), and eyewitness Jimmy Franklin initially estimated "[t]he cop was approximately ten to twelve feet away from the male when he shot." (Dkt. #51-3, p.18). However, the Police Department's investigators later estimated, based on the location of the shell casing and testing done with Officer Garrett's gun to ascertain its ejection pattern, that the officer was 27 feet, 11 and 3/8 inches away. (Dkt. #51-3, p.33; Dkt. #42-1, p.8). The parties agree that, for the purposes of analyzing the motions for summary judgment, the court should use the distance estimated by the City's investigators.

Officer Garrett stood in the front yard, directly in front of the door, and slightly beyond an L-shaped sidewalk that approached the front porch. (*See* Dkt. 44-13, p.1; Dkt. #51-3, p.35). Officer Garrett says he could not back up because Mrs. Samuel was close by and he feared she would be taken hostage or attacked. According to Officer Garrett, Mr. Samuel "picked his right foot up, and he moved it in a forward motion in my direction." (Dkt. #44-1, p.21). Diana Lance, a neighbor who witnessed the incident, says Mr. Samuel made a movement, which she describes as a jump. Officer Garrett shot once, killing Mr. Samuel.

Police dispatch received a call for EMS (Emergency Medical Services) for a gunshot wound at 23:48:24, one minute and sixteen seconds after Officer Garrett arrived on the scene.

---

[2] The plaintiff does not contest this fact in response the City's motion for summary judgment, but contests it in response to Officer Garrett's motion for summary judgment. *See* Dkt. #39, p. 3, ¶ 14. At the hearing held on November 17, 2011, plaintiff's counsel also described these steps in his recitation of the facts.

The autopsy report showed Mr. Samuel's blood alcohol content was 0.29%, almost three times the legal limit, although Officer Garrett did not know Mr. Samuel was under the influence at the time of the shooting.

### III. Plaintiff's Constitutional Claims

The City seeks summary judgment on the plaintiff's claims that Officer Garrett used excessive force and violated Mr. Samuel's constitutional rights.[3] "[A]*ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97; *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

The use of deadly force "is justified under the Fourth Amendment if a reasonable officer in Defendants' position would have had probable cause to believe that there was a *threat of serious physical harm to themselves* or to others." *Estate of Larsen v. Murr*, 511 F.3d 1255,

---

[3] Plaintiff asserts excessive force claims based on the Fourth, Fifth, and Fourteenth Amendments. However, as set forth above, the Supreme Court directs that all such claims are to be analyzed under the Fourth Amendment and its 'reasonableness' standard.

1260 (10th Cir. 2008) (emphasis in original). "A reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is 'often . . . too late to take safety precautions.'" *Id.* To assess the degree of threat, courts consider a number of non-exclusive factors, including: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect. But in the end the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Id.* (citations omitted).

Regarding the first factor, it is undisputed that Officer Garrett warned Mr. Samuel twice to drop his knife, but the warnings went unheeded and unacknowledged.[4] Although Officer Garrett never explicitly warned Mr. Samuel that he might be shot, the officer had his service weapon trained on Mr. Samuel throughout the confrontation. The plaintiff provides no legal authority for the proposition that an officer must explicitly warn someone that they will be shot prior to using deadly force. The case law submitted by the parties does not specify the type of warning an officer must give. *See Estate of Larsen*, 511 F.3d at 1260 (upholding summary judgment for an officer who warned the decedent to drop his knife but did not warn the decedent that deadly force would be used); *Tennessee v. Garner*, 471 U.S. 1, 12 (1985) (where feasible, an officer should provide "some warning"); *Thomson*, 584 F.3d at 1321 ("[a] warning is not invariably required even before the use of deadly force."). Consistent with federal law, the City's deadly force policy states: "[w]here feasible, a verbal warning shall be given to the

---

[4] The Tenth Circuit has repeatedly treated commands for a suspect to drop his or her weapon as a warning. *See Estate of Larsen*, 511 F.3d at 1263 (the suspect "ignored repeated warnings to drop his weapon"); *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1310 (10th Cir. 2009) ("The officers ordered Mr. Thomson to put the gun down and come out with his hands up, stating they would then call off the dog. When Mr. Thomson did not follow the officers' instructions, they repeated their warning").

offender prior to the use of deadly force." (Dkt. #42-1, p.39). In this case, Officer Garrett twice warned Mr. Samuel to drop his weapon and Mr. Samuel failed to comply with the officer's commands.

Regarding the second factor, Mr. Samuel made a number of hostile motions. It is undisputed that Mr. Samuel had the knife raised about shoulder level, and came out of the house onto the porch to face Officer Garrett. Mr. Samuel pointed the knife at the officer. Eyewitness Diana Lance described Mr. Samuel's posture as "menacing," and that "he looked like he was coming off the porch." (Dkt. #44-10, p.2). Jimmy Franklin described Mr. Samuel as "waving his arms" and "hollering at the cop." (Dkt. #51-3, p.22). No witness described Mr. Samuel's posture as submissive or as an attempt at surrender.[5] Moreover, it is undisputed that immediately before being shot, Mr. Samuel made some sort of movement. Officer Garrett states he shot Mr. Samuel when Mr. Samuel "began to take another step forward." (Dkt. #44-7, p.3). Diana Lance stated Mr. Samuel "jumped" immediately before Officer Garrett shot him. (Dkt. #44-10, p.4-5). Jimmy Franklin turned his head and took his eyes off Mr. Samuel to address Officer Garrett the moment before Officer Garrett fired. As a result, Franklin did not see Mr. Samuel move, but concedes that Mr. Samuel "might have been" moving at the time the officer shot. (Dkt. #51-3, p.22-23, 25).

Regarding the third factor, Officer Garrett and eyewitness Jimmy Franklin both perceived the distance separating the officer and the suspect to have been 15 feet or less. However, as previously stated, this court uses the City's estimate of the distance as approximately 28 feet. Mrs. Samuel argues that, at a distance of 28 feet, it was unreasonable for Officer Garrett to use deadly force. The Tenth Circuit, however, has held that "[o]ur cases decline to adopt a per se

---

[5] Plaintiff argues that Mr. Samuel was holding the knife up in a "submissive" posture, and had his arms raised in the "universal sign of surrender" but no witness describes Mr. Samuel's posture in that way. These characterizations are solely those of plaintiff's counsel.

rule where distance alone would create a fact question as a matter of law." *Estate of Larsen*, 511 F.3d at 1262. In *Estate of Larsen*, the Tenth Circuit affirmed a district court that considered a distance of 20 feet in its totality of the circumstances analysis, and rejected "the proposition that any particular distance makes the use of force unreasonable." *Id.* at 1262.

The evidence in this case is that Broken Arrow police officers are trained in the "21-foot rule," a guideline reflecting the minimum distance in which an officer can recognize and respond to threats. (Dkt. #39-8, p. 4). An individual armed with an edge weapon within 21 feet of an officer "is able to advance [to] the officer and attack with a knife and the officer not have the time to recognize the threat, determine his course of action, and then to implement that action." (*Id.* at p.5). For the purpose of the motions for summary judgment, Mr. Samuel was only about seven feet beyond the *minimum* distance within which an officer has time to recognize the threat, determine his or her course of action, and implement that action. In addition, Officer Garrett feared that Mr. Samuel might try to attack Mrs. Samuel or take her hostage. Mrs. Samuel was close by on the driveway, as was Jimmy Franklin.[6] She was off to Officer Garrett's left, so Mr. Samuel could have reached her without going through Officer Garrett.

Regarding the fourth factor, Mr. Samuel clearly manifested violent intentions. He did not have a knife before the officer arrived. As soon as the officer arrived, he kicked in the front door to get a knife. He quickly reappeared with the knife raised at shoulder level and confronted the officer in a menacing fashion. Officer Garrett was aware he was engaged with a violent suspect because he had been called to the residence on a report of domestic violence. Although Mrs. Samuel told Officer Garrett that everything was okay, her statement was clearly at odds with Mr. Samuel's observable behavior.

---

[6] Franklin estimates he was closer to Mr. Samuel than Officer Garrett at the time of the shot. (Dkt. #51-3, p.18, lines 1-7).

The plaintiff offers the opinions of her expert witness, Roger Clark ("Clark"), to demonstrate that the shooting was unreasonable. Clark opines that Officer Garrett was unreasonable in his use of deadly force in three ways:[7]

- Failure to conduct the "cover officer—contact officer" tactical approach to the scene;
- Failure to place himself in positions of "tactical advantage;" and
- Failure to deploy less-lethal equipment/weapons.

(Dkt. #39-2, p.7).

Clark first opines that Officer Garrett should have waited for a second officer to arrive on scene. While it is City policy to assign two officers to all domestic violence calls, there is no evidence that City policy requires a responding officer to wait for a second officer before getting out of his vehicle. Here, upon arrival, Officer Garrett saw a man and a woman near the garage. Viewing the circumstances from the perspective of a reasonable officer responding to a domestic violence call, Officer Garrett needed to be concerned about the woman's safety even though the couple was not physically fighting when he arrived. Mr. Samuel then escalated the situation by kicking in the door, retrieving a knife, and confronting the officer. Once Mr. Samuel emerged from the front door with a knife, it would not have been reasonable for the officer to return to his cruiser and place Mrs. Samuel and Mr. Franklin at risk. The court concludes that Officer Garrett was objectively reasonable when he exited his cruiser prior to the arrival of backup in order to evaluate the situation between Mr. and Mrs. Samuel. Moreover, it was reasonable for Officer Garrett to remain in the yard where he could protect Mrs. Samuel and Mr. Franklin.

Second, Clark opines that Officer Garrett was unreasonable because he failed to place himself in a position of "tactical advantage." Specifically, Clark says the officer had "the entire open and unobstructed yard area . . . in which to tactically move as necessary to avoid Mr.

---

[7] Mr. Clark bases his opinions in large part on the application of standards established by California's Commission on Peace Officer Standards and Training ("POST").

Samuel" and also "had the tactical protection ("cover") provided by his police vehicle which was parked immediately nearby at the curb in front of the house." *Id.* Clark fails to explain, however, how Officer Garrett should have positioned himself so as to address the threats Mr. Samuel posed both to the officer and the bystanders. Had Officer Garrett moved backwards, or away from the driveway, he would have left Mrs. Samuel and Mr. Franklin undefended and in danger of attack or being taken hostage. Because of the bystanders' close proximity, Officer Garrett could not have reasonably retreated to his cruiser, and it was reasonable for the officer to remain in his position in the yard.

Lastly, Clark opines that Officer Garrett should have deployed less-lethal equipment against Mr. Samuel, such as his taser. Clark says that, "even if Mr. Samuel should actually physically charged (sic) towards Officer Garrett in a threatening manner with a knife in hand, there were numerous other far more reasonable physical options available that precluded shooting Mr. Samuel." (Dkt. #39-2, p.11). However, the law provides that an officer may be justified in the use of deadly force where the suspect is wielding a knife. *See Estate of Larsen*, 511 F.3d at 1260-61 (upholding the grant of summary judgment in favor of the defendant officer who used deadly force against a knife-wielding suspect). In the situation presented here, where Mr. Samuel posed a threat to the officer and to bystanders with deadly edged weapon, the law did not require Officer Garrett to holster his service weapon and re-engage Mr. Samuel with a taser.

This case is unlike *Zuchel v. Spinharney*, 890 F.2d 273, 275 (10th Cir. 1989), where the decedent was shot and killed at a distance of 10-12 feet while wielding a pair of fingernail clippers. In that case, the decedent was "neither charging [the officer] nor stabbing at him," and a dispute existed as to whether the decedent was warned by the officer. *Id.* In this case, Mr.

Samuel presented a greater threat than the decedent in *Zuchel* due to the size of the knife he wielded, his menacing posture, his jump prior to the officer's shot, and the potential threat he posed to Mrs. Samuel and Mr. Franklin. Moreover, unlike *Zuchel*, it is clear that Office Garrett repeatedly warned Mr. Samuel to drop his knife.

This case is also distinguishable from *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006), where the decedent was known to be a suicide risk, but evidence existed that the officers had been told he was not a risk to others. The decedent emerged from his car and held a knife to his own wrists. An officer, mistakenly believing the decedent was holding a gun, opened fire on the decedent from a range of approximately 21 feet and killed him. In addition, there was a dispute as to whether the officer warned the decedent. The Tenth Circuit held summary judgment was improper because there was sufficient evidence in the record that the officer was unreasonable in believing the decedent was holding a gun.

Having considered the totality of the circumstances, including the four non-exclusive factors discussed above, this court concludes that the use of deadly force was justified under the Fourth Amendment, as Officer Garrett had probable cause to believe that Mr. Samuel posed a threat of serious harm to the officer and to others. This case is closely analogous to *Estate of Larsen*, 511 F.3d at 1260-61, referenced above, where the Tenth Circuit upheld summary judgment in favor of the defendant city and its officer who used deadly force late at night against a suspect armed with a knife. The distance here, though greater than that in *Estate of Larsen*, is not determinative. Mr. Samuel posed a greater threat than the suspect in *Estate of Larsen*, because Mr. Samuel presented a threat both to the officer and to civilian bystanders. Officer Garrett had to make a "split-second judgment[]" that should not be evaluated with the "20/20 vision of hindsight." *Id.* at 1259, 1261. The evidence does not present a sufficient disagreement

to require submission to a jury, and the facts are so one-sided that the defendants must prevail as a matter of law.  *Anderson*, 477 U.S. at 251-52.[8]

## IV.  Other Claims Against the City

The City seeks summary judgment on plaintiff's remaining legal theories:  negligent supervision/retention, negligence liability through *respondeat superior*, and failure to train.

In order to survive summary judgment on a claim for negligent supervision and retention, plaintiff must show a genuine issue of material fact exists as to whether:  "(1) [the] Officer [] engaged in a wrongful act that injured [the plaintiff]; and (2) that defendant [City] was negligent in supervising or retaining [the officer]."  *Rollins v. Town of Haskell, Okla*., 2009 WL 3614784 *10 (E.D. Okla. 2009) (citing *N.H. v. Presbyterian Church*, 998 P.2d 592 (Okla. 1999)).  As discussed above, plaintiff has failed to show that Officer Garrett acted unreasonably, and therefore no wrongful act occurred that could create liability for the city.  If a wrongful act occurred, the plaintiff must still present evidence of the elements of negligent supervision; "[t]he critical element for recovery is the employer's prior knowledge of the servant's propensities to create the specific danger resulting in damage."  *N.H.,* 998 P.2d at 600.

The plaintiff has presented no evidence that Officer Garrett had a propensity, through his use of Adipex-D or otherwise, to use excessive force.  Dr. Hyde, the physician who prescribed Adipex-D for Officer Garrett, knew Officer Garrett was a police officer.  Dr. Hyde stated he would not have prescribed any medication to Officer Garrett which would affect his judgment.  Dr. Hyde also stated the main side effect of Adipex-D for Officer Garrett would be a potential

---

[8] Because the court holds Officer Garrett was objectively reasonable in his use of deadly force, the court need not examine the plaintiff's argument that Officer Garrett's actions were affected by the prescription appetite suppressant Adipex-D.  Moreover, there is no evidence the officer was impaired or that he took the prescription medication on the day in question.

effect on Officer Garrett's blood pressure. (Dkt. #51-3, p. 53). Moreover, Officer Garrett reported he never had any side-effects from his use of the appetite suppressant. (Dkt. #42-1, p. 25). The generalized warnings on the label for Adipex-D and in materials provided by Sig Sauer are insufficient to create a causal connection between Officer Garrett's alleged use of Adipex-D and any alleged propensity to use excessive force. The plaintiff has presented no evidence that the City was aware Officer Garrett used Adipex-D, or that he had a propensity to use excessive force. The court concludes the City is entitled to summary judgment on plaintiff's claim of negligent supervision/retention.

Plaintiff alleges the City is liable on a state law claim of negligence under a theory of *respondeat superior*. However, as set forth above, she has failed to show that the officer's actions were objectively unreasonable. Because no tortious act took place, the City cannot be liable for negligence under a theory of *respondeat superior*.

With regard to plaintiff's claim for failure to train in the use of deadly force, a Plaintiff must first prove the training was in fact inadequate, and then satisfy the following requirements:

> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the party of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training."

*Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003). When there is no underlying constitutional violation by an officer, there can be no § 1983 action for failing to train or supervise the officer. *Apodaca v. Rio Arriba Cnty. Sheriff's Dept.*, 905 F.2d 1445, 1447 (10th Cir. 1990). As the plaintiff has not shown that Officer Garrett exceeded constitutional

limitations on the use of force, the City is entitled to summary judgment on plaintiff's claim for failure to train.

An alternative ground supports the grant of summary judgment for the City on the claim for failure to train. The plaintiff has failed to meet the third *Carr* requirement – that the alleged inadequate training[9] demonstrates a deliberate indifference to citizen safety. The evidence before this court is that the City of Broken Arrow trains its officers in the "21 foot rule" as a minimum distance within which an officer has time to recognize the threat, determine his or her course of action, and implement that action, but that, under proper circumstances, the use of deadly force may be reasonable at greater distances. There is no evidence that any such training amounts to deliberate indifference. Plaintiff's characterization of the training is misleading. Next, the City has a verbal warning policy on which its officers are trained. The policy provides that "[w]here feasible, a verbal warning shall be given to the offender prior to the use of deadly force." To the extent the plaintiff argues Officer Garrett did not provide an adequate warning to Mr. Samuel, this argument goes to the reasonableness of Officer Garrett's warnings, not to a claim of failure to train. Moreover, there is no evidence that the City's training on verbal warnings prior to the use of force demonstrates a deliberate indifference to citizen safety. Finally, the plaintiff fails to show that the City's training with respect to the "two officer" policy in response to domestic violence calls was deliberately indifferent to citizen safety. To the extent plaintiff contends Officer Garrett failed to follow this policy, her argument goes to the reasonableness of the officer's conduct under the particular circumstances presented; it does not support an alleged failure to train or deliberate indifference to citizen safety. The court

_____

[9] The plaintiff specifies three alleged failures in the City's training: 1) that Officer Garrett was allegedly trained to use deadly force at a range of 10 yards when confronting someone wielding an edged weapon; 2) the City had no policy with regard to providing a warning before using deadly force; and 3) Officer Garrett was improperly trained on the department's policy for two officers to respond to domestic violence calls. Dkt. #39, pg. 14.

concludes that defendant City is entitled to summary judgment on plaintiff's claim for failure to train.

## V. Qualified Immunity

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Gross v. Pirtle*, 245 F.3d 1151, 1155 (10th Cir. 2001). Qualified immunity is a "purely legal question," which should be resolved "at the earliest possible stage in litigation." *Id*. To get past the qualified immunity defense, the plaintiff must show that "[t]aken in the light most favorable to the party asserting the injury, [] the facts alleged show the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Additionally, the plaintiff must show that the constitutional right "was clearly established." *Id.*

Here, the plaintiff has failed to establish a constitutional violation because she did not meet her burden of demonstrating that the shooting of Mr. Samuel was objectively unreasonable under the circumstances. Consequently, Officer Garrett is entitled to summary judgment on the basis of qualified immunity.

In the alternative, Officer Garrett is entitled to summary judgment because qualified immunity shields an officer from suit when he makes a decision that, even if unconstitutional, reasonably misapprehends the law governing the circumstances he confronted. *Id*. at 205. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202. "[T]o deny summary judgment any time a material issue of fact remains on the excessive force claim [] could undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on

summary judgment.'"  If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  *Id.* (citations omitted).[10]

   "It is the plaintiff's burden to convince the court that the law was clearly established. In doing so, the plaintiff cannot simply identify a clearly established right in the abstract and allege that the defendant has violated it. Instead, the plaintiff 'must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited.'" *Medina v. City and Cnty. of Denver*, 960 F.2d 1493, 1497 (10th Cir. 1992).  "It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Saucier*, 533 U.S. at 205.  The controlling case authority "does not always give a clear answer as to whether a particular application of force will be deemed excessive by the courts.  This is the nature of a test which must accommodate limitless factual circumstances . . . Qualified immunity operates in this case, then, just as it does in others, to protect officers from the sometimes 'hazy border between excessive and acceptable force.'" *Id.*

   In this case, Officer Garrett responded to a domestic violence report.  He saw Mr. Samuel kick in the door of a house to obtain a knife to confront him.  Mr. Samuel had the knife raised

---

[10] "In addressing the legal issue in the qualified immunity context of a violation *vel non* of a clearly established constitutional right, however, the principal purpose of assessing whether plaintiff's evidence gives rise to genuine issues of material fact is different than it is in the traditional summary judgment analytic paradigm. Specifically, contrary to the latter, the objective is *not* to determine whether a plaintiff survives summary judgment because plaintiff's evidence raises material issues that warrant resolution by a jury. Instead, the principal purpose is to determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the *legal* question before the court." *Thomson*, 584 F.3d at 1326 (Holmes, concurring).

and pointed toward the officer, and he refused to drop the weapon despite two commands from the officer. Officer Garrett shot Mr. Samuel from what he perceived to be a distance of 10-15 feet but which for purposes of this motion was just under 28 feet. Distance alone does not establish as a matter of law that an officer's action in the use of deadly force is clearly prohibited. *Estate of Larsen*, 511 F.3d at 1262. In short, the plaintiff has not demonstrated "a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Medina*, 960 F.2d at 1497. Even if the officer made a mistake as to what the law requires, the mistake was reasonable, and this court concludes the officer is entitled to qualified immunity on alternative grounds.

WHEREFORE, for the reasons set forth above, the Motion for Summary Judgment (Dkt. #26) of the defendant City of Broken Arrow is granted, and the Motion for Summary Judgment (Dkt. #44) of defendant Officer Stephen Garrett is granted.

DATED this 5th day of December, 2011.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma