```
1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF OKLAHOMA

3

4    RUTH SAMUEL as the Personal     )
     representative of the Estate,   )
5    of Nathan Samuel, deceased,     )
                                     )
6                   Plaintiff,       )
                                     )
7    V.                              )   No. 10-CV-683-GKF-TLW
                                     )
8    CITY OF BROKEN ARROW, Oklahoma  )
     a municipal corporation and     )
9    STEPHEN GARRETT, an individual, )
                                     )
10                  Defendants.      )

11

12

13            REPORTER'S TRANSCRIPT OF PROCEEDINGS

14              HAD ON NOVEMBER 17, 2011

15                   MOTION HEARING

16

17   BEFORE THE HONORABLE GREGORY K. FRIZZELL, Judge

18

19   APPEARANCES:

20   For the Plaintiff:    Mr. George M. Miles
                           Mr. Steven R. Hickman
21                         Frasier, Frasier & Hickman
                           1700 SW Boulevard, Suite 100
22                         Tulsa, Oklahoma 74107

23   For the Defendant     Ms. Elizabeth A. Wilkening
     City of Broken        Mr. Trevor A. Davis
24   Arrow:                City of Broken Arrow
                           Post Office Box 610
25                         Broken Arrow, Oklahoma 74013
```

(APPEARANCES CONTINUED)

For the Defendant        Mr. Scott B. Wood
Stephen Garrett:         Wood Puhl & Wood
                         2409 East Skelly Drive, Suite 200
                         Tulsa, Oklahoma 74105
                         -    -    -    -    -

CONTENTS

ARGUMENT:

                                                Page No.

     By Mr. Wood....................................... 3

     By Mr. Miles..................................... 20

     By Mr. Wood...................................... 30

     By Ms. Wilkening................................. 31

     By Mr. Miles..................................... 47

     By Ms. Wilkening................................. 52

                         -    -    -    -    -

PROCEEDINGS

November 17, 2011

          THE COURT:  Be seated please.

          THE CLERK:  We're here in the matter of Ruth Samuel

vs. City Broken Arrow, et al., Case Number 10-CV-683-GKF.  Will

the parties please enter their appearances.

          MR. MILES:  George Miles and Steven Hickman on behalf

of the plaintiff.

          THE COURT:  Good afternoon.

          MR. WOOD:  Scott Wood on behalf of the defendant

Stephen Garrett.

1        MS. WILKENING:  Liz Anne Wilkening and Trevor Dennis

2   on behalf of the City of Broken Arrow.

3        THE COURT:  Good afternoon.  Which motion have you-all

4   decided we ought take up first?

5        MR. WOOD:  Judge, we discussed that.  I think it makes

6   probably more sense for me to go first.

7        THE COURT:  Very well.  And just to let you know,

8   because this case involves a death I think rather than rule

9   from the bench here we need a written order so I'm not

10  intending to issue a decision from the bench here today.

11       MR. WOOD:  Very well.  May it please the Court.  Your

12  Honor, on the evening of October 6, 2009, the plaintiff, Ruth

13  Samuel, was in her home in Broken Arrow on East 36th Place when

14  she went outside to smoke a cigarette on her driveway.  Shortly

15  after that her estranged husband, Nathan Samuel, arrived,

16  parked his car in the driveway and they began a conversation.

17  That conversation degenerated into an argument and Nathan

18  Samuel became angry and started calling the plaintiff names,

19  and then he finally pushed her to the ground and grabbed her by

20  the neck and began choking her.  Ruth Samuel cried out for help

21  and her neighbor, Jimmy Franklin, heard her and came outside

22  and when he saw what was happening he dialed 911.  The 911

23  operator in the City of Broken Arrow was told that "There's a

24  guy beating up a woman."  Franklin also reported that, "I don't

25  think I should get involved because he's pretty mean."  And

1   finally he told the dispatcher "I'm afraid she's going to get

2   hurt."

3         The call was dispatched and Officer Kevin Hunsberger

4   was assigned as the primary officer, Officer Garrett was

5   assigned as his backer.  However, Garrett was less than a mile

6   away and he arrived in just a few minutes, ahead of Hunsberger,

7   at the house in the 209 block of East 36th Place.

8         The following that I'm getting ready to outline took

9   place in about 60 seconds.  Officer Garrett pulled up and was

10  looking for the house numbers on 36th Place when he shined the

11  light on plaintiffs house and saw Nathan Samuel and the

12  plaintiff standing at the top of the driveway near the garage.

13  As Officer Garrett stopped his car and parked it and began to

14  get out he observed Mr. Samuel make a beeline for the front

15  door of the house.  Mrs. Samuel had locked the door with a key

16  before she had come out to smoke her cigarette and Mr. Samuel

17  went right up to the door and kicked it open by putting his

18  foot out in front and knocking the door open.  He then entered

19  into the house and Officer Garrett proceeded from his car

20  across the front yard towards where Mrs. Samuel was near the

21  driveway.  She came out into the yard a few feet to visit with

22  him and she told him, "Hey, everything's okay, we don't need

23  you here."  Officer Garrett about that time heard the distinct

24  noise of a kitchen utensil drawer being opened and closed,

25  prompting him to ask the question of Ms. Samuel, "Does he have

any weapons?"  Officer Garrett reported that she replied either "He's getting a knife" or "He's got a knife."  At that time Officer Garrett directed Ms. Samuel to get back away from that area and she moved back toward the driveway from where she had come.

In the meantime, Officer Garrett could see into the how soon the front door of the house was open after being kicked in and there was a hallway that led back to a living area and also if you go into the house and turned to the left there's a kitchen area.  When he looked back down into the house he could see Nathan Samuel coming out of the kitchen walking towards the front door.  He was holding something, but he couldn't tell what it was as yet.  Mr. Samuel continued towards Officer Garrett who is now standing in the front yard almost directly in line with the front door and when Mr. Samuel crosses the threshold of the door, Officer Garrett can see that he's got a large knife in his hand.  He estimated it to be between 8 and 12 inches.  As it turns out from the physical evidence we know it was a 10-inch porterhouse steak knife.  As Mr. Samuel crossed the threshold he raised his arms up with the knife in his right hand with the blade pointed towards Officer Garrett.  He came across the threshold and stopped.  Officer Garrett ordered him to put the knife down and then on his lapel microphone said to the dispatcher, "He's got a knife, speed it up," referring to getting help or getting a backer there more

quickly.

Officer Garrett had drawn his weapon when he had heard that he was getting a knife and almost simultaneously could hear the utensil door rattling, so he already had his gun out and in his hand. He was pointing it at Mr. Samuel when he ordered him to drop the knife. Instead of following that lawful command, Nathan Samuel took two more steps towards Officer Garrett, still holding the knife up near the top of his head with the blade pointed forward.

THE COURT: Okay. That's from threshold?

MR. WOOD: He had passed the threshold a step or two and then stopped.

THE COURT: All right. And then took two steps?

MR. WOOD: And then took two steps.

THE COURT: All right. Now, is this undisputed?

MR. WOOD: Yes, it is.

THE COURT: As to the two additional steps?

MR. WOOD: I believe it is undisputed, yes.

THE COURT: All right. And this is two more steps after ordered to drop the knife?

MR. WOOD: Correct. At that point Officer Garrett gave another command to drop the knife, but Mr. Samuel did not. He maintained his stance and his positioning with the knife blade towards Officer Garrett.

THE COURT: All right, now at this point is he still

1    on concrete or is he out into the yard?

2              MR. WOOD:  He is still on the porch of the house, Your

3    Honor.

4              THE COURT:  After the two steps?

5              MR. WOOD:  After the two steps he's still on the

6    porch.

7              THE COURT:  Okay.

8              MR. WOOD:  Officer Garrett at this point, he's

9    testified that it was his recollection that he was at the very

10   end of the sidewalk that led out from the house, that makes an

11   L turn and goes back over towards the driveway.  There's a

12   photograph of --

13             THE COURT:  I've seen it.

14             MR. WOOD:  -- of the layout.

15             THE COURT:  But you're saying the officer is

16   contending he's all the way out to the edge of the concrete

17   next to the yard or is he still on the porch between...

18             MR. WOOD:  He believes he was right here, Your Honor,

19   at the end of the sidewalk that comes the straight out from the

20   porch.

21             THE COURT:  All right.  That's the officer's

22   testimony?

23             MR. WOOD:  Yes.

24             THE COURT:  Okay.  But that's after the two steps?

25             MR. WOOD:  Yes, he believes that -- he doesn't ever

1    remember advancing any more after he moves Mrs. Samuel over to

2    the driveway. Right.

3        Now, other people, the next door neighbor and Mrs.

4    Samuel put him further out into the yard which would be, that

5    would be going, I guess, to the north.

6        THE COURT: All right, help me out in terms of

7    discretions then.

8        MR. WOOD: The photograph in Exhibit No. 13 in the

9    motion for summary judgment is looking to the east, so that the

10    right would be to the south.

11        THE COURT: Right.

12        MR. WOOD: And the left would be to the north.

13        THE COURT: Right. And then where did the body rest.

14        MR. WOOD: Judge, if you look at that post that's on

15    edge of the porch.

16        THE COURT: Yes.

17        MR. WOOD: Right behind that post.

18        THE COURT: Right. So in any event, in the light most

19    favorable to the plaintiff here, when he advanced the two steps

20    he's still on the porch about in line with the post there?

21        MR. WOOD: I would agree with that, yes, sir.

22        THE COURT: All right. Go ahead.

23        MR. WOOD: Officer Garrett is analyzing the situation.

24    He knows he can't move or back up because he does not want to

25    allow Mr. Samuel access to the lady he had just been assaulting

1  who is on the driveway at this the point and he believes -- his

2  testimony was he believed that at that point Mr. Samuel was 10

3  to 15 feet away from him.  Mr. Samuel then took --

4      THE COURT:  All right, let me ask you about that

5  because we've had some discussion about that.  I mean to some

6  extent that's self-serving.  I can't really take that into

7  consideration when the City of Broken Arrow in their

8  investigation said he was 27 feet and some inches; correct?

9      MR. WOOD:  Well, that is true, Your Honor, and that

10  was based on where the shell casing was found, but -- and for

11  the purposes of summary judgment we don't dispute that.  We

12  believe that even if he was at 27 feet, under the analysis as

13  set forth in the Larsen case, Officer Garrett was still within

14  his right to use deadly force.

15      THE COURT:  All right, but for purposes of summary

16  judgment I have to evaluate it at 27 feet, don't I?

17      MR. WOOD:  We would agree with that and I think that's

18  how we set it forth in our papers.

19      THE COURT:  All right.  Go ahead.

20      MR. WOOD:  Officer Garrett, believing that his life

21  was in imminent danger, as well as Ruth Samuel's, observes Mr.

22  Samuel begin to take another step towards him.  He lifts his

23  leg up as he had just a few seconds ago before taking two steps

24  and Officer Garrett fires one shot striking Mr. Samuel to the

25  chest and he falls to the ground.  Officer Garrett immediately

1 calls for EMS, he goes up to the body, kicks the knife away

2 from Mr. Samuel and within probably 15 or 20 seconds the second

3 officer, Officer Hunsberger, arrives on the scene.

4 THE COURT: Now let's back up just a second here. You

5 say Officer Garrett perceived that Mr. Samuel took another step

6 toward him and there's some discussion about exactly what

7 happened here. One of the witnesses -- and let me get her

8 name.

9 MR. WOOD: Diana Lance.

10 THE COURT: Lance describes the movement as a jumping

11 movement of some sort; correct?

12 MR. WOOD: Correct.

13 THE COURT: All right. Now because some of the

14 caselaw here talks about lunging or movements toward the

15 officer, does it make any difference whether or not the

16 movement is characterized as a step toward or a jumping

17 movement?

18 MR. WOOD: Your Honor, I don't think so, I think it's

19 a furtive movement showing an intent on the part of Mr. Samuel.

20 He's already been ordered at least three or four times to drop

21 this knife. He's ignored all of those commands, continued to

22 hold the knife with the blade pointed towards Officer Garrett

23 and then takes yet another, begins to take another step towards

24 him. And Diane Lance, of course, is directly across the street

25 watching this from her bay window. And she likewise describes,

I think her term was "He was in a menacing stance" were the words that she used.

THE COURT: What were her exact words with regard to the movement that she perceived?

MR. WOOD: Yeah, I believe that's on page 47 and 48 of her deposition. Going to page 47 line 12:

"And from the time he came out the front door and raised his arms in the menacing stance as you described, did he ever move?

"Yes, sir, he did.

"Okay. Did he move off the porch?

"He looked like he could come off the porch. He jumped. I don't know if it was forward or just a jump.

"Question: He looked liked he could come off the porch?

"Yes, sir.

"Question: What do you mean by that?

"Well, when you do a motion you can either go forward or not if you jump, and I cannot make --

"Question: I guess you could either go forward or backwards or side to side or up?

"Up, correct.

"Is it my understanding that you believe that he went up air, like jump?

"Yes, sir.

1          "So the movement you saw Mr. Samuel make from the time

2     when you saw him on the porch until he was shot, you thought he

3     jumped?

4          "Yes, sir."

5          And, Judge, you know, it's hard to read into someone's

6     mind what their perception was when someone observes something

7     a little bit shocking like this in their own neighborhood, but

8     whatever it was it could be considered a furtive movement by

9     Officer Garrett which I believe entitled him to use deadly

10    force at that time.

11         THE COURT:  Go ahead.

12         MR. WOOD:  And Judge, if you look at the case that we

13    cited in our papers, the Estate of Larsen vs. Murr and the City

14    and County of Denver, the case is amazingly similar and on

15    point with what we have in our case.  The Murr case was

16    decided -- or Larsen, I'm sorry, was decided in January, 2008

17    and that involved a call where the suspect had threatened to

18    kill himself or somebody else.  It was late at night.  Officers

19    responded to a 911 call, just as we did in this case, and when

20    they arrived they found Mr. Larsen on the front porch of a

21    house, elevated, I think there were six steps leading up to

22    that porch, and he had a large butcher knife.  I think even one

23    of the officers described it as a small sword.  He was ordered

24    to drop the knife several times, but never did, and when

25    officer Murr perceived that he was being -- aggressing him or

coming towards him, he fired twice and killed Mr. Larsen.

Of course the framework that the court uses to analyze the use of force is straight from Graham vs. Connor where they say the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight. The court goes on to cite the Graham v. Connor case and say police officers are often forced to make split second judgments in circumstances that are tense, uncertain and rapidly evolving about the amount of force that is necessary in a particular situation. The reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective.

So that in this case, Your Honor, I think that even if Officer Garrett's assessment of the threat was mistaken it was not objectively unreasonable.

The court goes on to say, gives a little outline of how to assess the threat and they set forth a number of, I think there was four of them, nonexclusive factors which included whether the officers ordered the suspect to drop his weapon, which was done in this case. Whether the suspect complied with the police commands, which he did not. Whether any hostile motions were made with the weapon towards the officers? They found in the Larsen case that the fact that he held the blade of the knife pointed towards them and then moved

towards them satisfied that analysis.  The next factor is the

distance separating the officers and the suspect; and lastly

the manifest intentions of the suspect.

In that case the suspect had stated that he wanted to

either kill himself or kill someone.  In this case Mr. Samuel

had already committed a felony by grabbing his wife by the neck

holding her down on the ground and choking her.  I believe it's

21 644 O.S. H makes domestic assault and battery by

strangulation a felony.

THE COURT:  Is it clear that the officer knew of that?

MR. WOOD:  What the officer was told on the radio when

the call was assigned was that a man was physically assaulting

his wife or beating her up and it was in progress.

Of course, the second part of that analysis is when

you are confronted by someone who is armed with a weapon and

they don't put it down when you tell them to, they point the

blade toward you, I believe under the law that is also an offer

to do harm and would also be considered a felony.

THE COURT:  But of course the distance is one of the

important circumstances here.  Obviously, if I menace you with

a knife from 50 feet that may not justify you, hopefully, in

shooting me through the heart.

MR. WOOD:  Correct.  Judge, we presented evidence in

our papers and through the affidavit of Dr. Lewinski, that

based on the scientific studies that they have done in studying

1   how much distance an assailant can cover in a second and a half

2   puts 27 feet well within the range of being in imminent danger

3   or the suspect posing an imminent threat of harm.

4          Judge, as we've argued in our papers, we feel that

5   Officer Garrett is entitled to judgment, first of all, because

6   no constitutional violation occurred.  Secondly, if you find

7   that a constitutional violation occurred, he's entitled to

8   qualified immunity because there's certainly no case that I was

9   able to find, especially as close on point as <u>Larsen</u> is, that

10  would put him on notice that such a use of force would be

11  considered unconstitutional.  In fact, in the <u>Larsen</u> case in

12  section 14 the court talks about the appellant arguing two

13  genuine disputes of material fact.  And they point out that,

14  they argued that Officer Murr provided inconsistent testimony

15  about the circumstances of the shooting; and second, the

16  distance separating Murr from Larsen.  They said that was

17  subject to dispute in that case.  They go on to say, the mere

18  existence of some alleged factual dispute between the parties

19  will not defeat an otherwise properly supported motion for

20  summary judgment.  The requirement is that there be no genuine

21  issue of material fact.

22         So with regard to this distance, there's been nothing

23  presented to the Court that would say Mr. Samuel was incapable

24  of reaching Officer Garrett with that knife within a second or

25  two.

1          THE COURT:  All right.  So it's been a while since

2     I've addressed one of these cases, but you're saying that if we

3     were to determine that first -- let me take a look here to get

4     the wording correct.  If we were to determine that there was an

5     issue of fact as to whether the officer's actions in using

6     deadly force was objectively reasonable in light of the

7     circumstances confronting him, then you're saying as to the

8     second evaluation for purposes of qualified immunity, is that

9     you are saying that there's no case that would put him on

10    notice that such a use of force would be considered

11    unconstitutional?

12         MR. WOOD:  Judge, I don't think so, especially if you

13    had a police officer read this case, I think it tells them that

14    distance is one of those factors to be considered, but as in

15    all Fourth Amendment analysis, eventually it's going to be on

16    the totality of the circumstances.

17         THE COURT:  All right, so you're saying this case you

18    are talking about Larsen?

19         MR. WOOD:  No, the Samuel vs. Garrett case.  Okay.

20         THE COURT:  All right.  You're saying it's such a gray

21    area that he would be entitled to qualified immunity?

22         MR. WOOD:  Right.  One of the things that's been

23    argued in this case, the Larsen case and our case, is a

24    training rule that developed in the early '80s, mid '80s,

25    called the 21-foot rule.  And basically officers were trained

1    that if someone had an edged weapon and got within 21 feet of

2    you, you were in imminent or immediate threat of harm.  Okay.

3    Of course plaintiffs' lawyers have seized on that and tried to

4    use it, as it's been attempted to use in this case, to say if

5    you're further than 21 feet away and use deadly force, then

6    it's unreasonable.  That was never the intent of this training

7    rule nor is that type of bright line rule consistent with the

8    analysis formula that's been set forth by the Supreme Court in

9    Connor, Graham vs. Connor, Brosseau vs. Haugen, Harris vs.

10    Scott.  All those cases say you have to look at each case

11    individually and determine that under the totality of the

12    circumstances.  And I think the court is right on point in

13    Larsen when they say that the distance is just one of several

14    factors to be taken into account.  In fact, on 1262 in the

15    Larsen case, and I'll read there into the record.  "In

16    assessing objective reasonableness we employ no bright line

17    rules, and in a totality of the circumstances analysis,

18    distance is but one factor of many.  Our cases decline to adopt

19    a per se rule where distance alone would create a fact question

20    as a matter of law."

21          THE COURT:  Do they discuss the 21-foot rule in

22    Larsen?

23          MR. WOOD:  Yes, they did, Your Honor, I believe they

24    did.  I think there was footnote about that if I'm not

25    mistaken.  Let me look.

1          THE COURT:  Certainly that quotation that you just

2     read would seem to imply that they were directing that to some

3     sort of absolute bright line rule.

4          MR. WOOD:  Correct.  Judge, I'm not finding that right

5     now, but on our second go around if I find it I'll bring it to

6     the Court's attention.

7          THE COURT:  All right, my recollection on qualified

8     immunity -- and it's frankly a little surprising that I haven't

9     had a qualified immunity case for awhile -- but as I recall the

10    caselaw, it's got to be something clearly established within

11    this circuit; correct?

12         MR. WOOD:  Correct, Your Honor.  It's a two-pronged

13    test set forth in Saucier vs. Katz and the first prong of that

14    test is did a constitutional violation take place.  The second

15    prong of the test is was the law clearly established at the

16    time of the incident.  And then about four or five years ago in

17    the case of Pearson vs. Callahan, the court said you don't have

18    to take your analysis in the order set forth in the Saucier

19    case.  You can look at, first, whether there is any established

20    law at the time of the incident which would put the officer on

21    notice that his acts were unconstitutional.

22         THE COURT:  These sorts of cases seem to arise a lot

23    in terms of knives, and although this is relatively irrelevant,

24    it's one of these cases.  As you-all know, and with experienced

25    lawyers on both sides, truth is often stranger than fiction.

1   And I had a case involving an individual who had been trying to

2   take his own life in his sister's bathtub on the north side and

3   the police were called and they came into the bathtub he had a

4   long butcher knife he came at the police.  You were not

5   involved in this case --

6          MR. WOOD:  No, I was not.

7          THE COURT:  -- and this is irrelevant to this

8   particular case, but I just thought you would both appreciate

9   the facts here.  And he was nude.  The police backed out into

10  the front yard.  He came out through the front door at a fairly

11  high rate of speed.  The light on the front porch was off and

12  he came off the porch at them with the knife over the head and

13  he winds up getting shot in the back.  And of course, getting

14  shot in the back is kind of a bad sign if you are a defendant,

15  but it turns out that when we tried the case he hit the railing

16  below his waist and came flipping over and was upside down when

17  the shots were fired and that's how he got shot in the back.

18         MR. WOOD:  Your Honor, in police cases like that one

19  and in police training nowadays, they teach you that your

20  target or what you shoot at is a target that's in the past

21  because by the time it takes you to decide to pull the trigger

22  and you pull the trigger, the movements of the suspect can be

23  quite different than the sight picture you had when you made

24  that decision to shoot.  Which brings me to my very last point.

25         THE COURT:  Which no one at summary judgment was able

1  to explain how he got shot in the back. So I think we wound up

2  going to trial and it became very clear to everybody. So go

3  ahead.

4          MR. WOOD: After this was responded to by the

5  plaintiff we submitted some evidence from the ME's report. One

6  of those was a picture that shows a wound trajectory rod placed

7  in Mr. Samuel's chest at the time of autopsy and it has a

8  downward angle. I don't think it's disputed that Officer

9  Garrett was straight, pretty much straight in front of Mr.

10  Samuel when he shot him, he might have been slightly down in

11  elevation because he was standing in the yard and not on the

12  sidewalk or the porch, but the downward trajectory of the

13  bullet indicates to us that Mr. Samuel was in motion when he

14  was shot, he wasn't standing straight up with his hands like

15  this. He had started to move and that would explain the

16  downward trajectory of the bullet.

17          THE COURT: Do we have any expert opinion analyzing

18  that downward --

19          MR. WOOD: Only the ME's report.

20          THE COURT: All right. Anything else?

21          MR. WOOD: Nothing further, Your Honor.

22          THE COURT: Mr. Miles.

23          MR. MILES: Thank you, Your Honor. Your Honor, first

24  of all, with regard to the last issue that Mr. Wood brought up

25  regarding the trajectory of the bullet, we have not had an

1    opportunity to respond to that allegation, it was new material

2    that was set forth in his reply, and we do take issue with that

3    and would like the opportunity to respond if the Court sees fit

4    that we need to do so.

5         THE COURT:  Well, insofar as its in the reply, as you

6    are well aware if I consider that then I have to give you an

7    opportunity to respond and it just perpetuates the briefing

8    forever so if that's in fact true that it's not raised until

9    the reply, as a factual matter I cannot consider it for

10   purposes of summary judgment anyway.  So go ahead.

11        MR. MILES:  Okay.  Thank you, Your Honor.  I think the

12   real dispute revolves around the question of whether or not

13   there was a constitutional violation here.  In other words, was

14   Officer Garrett justified in pulling the trigger on Mr. Samuel

15   that evening.  There are a lot of facts that we have a

16   particular dispute with that may not necessarily go to that

17   particular direct issue.  What we do know and what we do

18   believe is undisputed, that when Mr. Samuel entered the house

19   that evening Officer Garrett was told in words that he's got a

20   knife or he was getting a knife.  That's not disputed.  At that

21   time we believe the evidence shows that Officer Garrett at that

22   time drew his weapon.  This was before Mr. Samuel came out of

23   the residence.  The configuration of the house, if you look at

24   the photograph with the front door, when the front door opens

25   up there is a view down the hallway towards the kitchen.  I

1  believe the evidence is, and will show and does show for the

2  record, that Officer Garrett was not able to see Samuel in the

3  kitchen itself, but he heard the drawer and utensils rattling.

4  I believe the first time that Garrett, according to his

5  testimony, saw Samuel was when he came through the threshold of

6  the house and at that time his arms were raised above his head

7  with a 10-inch knife.  Now it's been described as porterhouse

8  steak knife or a butcher knife, but there's a photograph of the

9  knife in the record, it had a five inch blade, it was a steak

10 knife.  At the time --

11          THE COURT:  So the 10-inch knife includes the handle?

12          MR. MILES:  It includes of the handle.  So it's a

13 five-inch blade.  When he steps through the threshold he stops

14 with his arms above his head at that point.  He takes two more

15 steps and stops and is told by Officer Garrett to drop the

16 knife.  At this time, from the testimony from the witnesses,

17 are that Nathan Samuel kept his hands above his head the entire

18 time throughout this whole ordeal until he was shot.  The

19 photographs in the record in our reply to Officer Garrett's

20 motion that show Garrett describing the position of Samuel's

21 hands and also photographs from Mrs. Lance across the street to

22 show the position of Garrett's hands.  As Garrett described it,

23 he was holding the knife in a position like this with the blade

24 pointed towards him and the hands were elevated above the head.

25          It's undisputed that Nathan Samuel never said a word

1    to Officer Garrett that evening at all.  There was never

2    anything said by Mr. Samuel.  It's undisputed that Officer

3    Garrett never warned Samuel that he's going to shoot him.  The

4    testimony reflects that when Samuel stepped through the door,

5    stepped through the threshold he took two steps and stopped.

6    Garrett told him to drop the knife.  Samuel took one more step

7    forward, again with his arms extended before his head.

8              THE COURT:  One or two?

9              MR. MILES:  Initially he took two steps and then with

10   he took one more step.  When he took the second step his arms

11   again were still extended above his head.  Garrett told him

12   again to drop the knife.  It was at that point that Garrett

13   said he made the decision that if he takes another step I'm

14   going to shoot him.  And the testimony from Garrett is that he

15   started to take another step and he described it as him lifting

16   his right leg and that's when the shot was fired.

17             Ms. Lance, across the street, described the situation

18   at the time Samuel was shot was it looked like, it appeared to

19   him that she {sic} jumped up in the air, not forward, not

20   backward, not side to side, but up.  With regard to the --

21             THE COURT:  Well, now we just went over that

22   testimony, and you're construing it as the body jumping after

23   it was hit by the round, if I'm hearing you correctly.  But I

24   just read her testimony or rather it was just read into the

25   record and I didn't read it that way.  Do you want to go over

1  that?

2      MR. MILES:  No, I don't dispute the way, the

3  conclusion you've drawn from her testimony.  I think she

4  described his movement as jumping up.  Now whether or not that

5  was before or after the shooting, I don't think the testimony

6  can tell us that, but it was at that moment.

7      THE COURT:  Well, but that's what I'm saying, because

8  your implication is that he jumped when the round hit him,

9  that's what you're implying to me, but I don't know that you

10  can read that into what was just read here by counsel.

11      MR. MILES:  And I accept that, Your Honor, and I take

12  her testimony for exactly what she said.  She described him as

13  jumping up.

14      THE COURT:  All right, but the question is as to when.

15  Let me take another look at that.  What was he hit with by the

16  way, was it a .40 caliber?

17      MR. MILES:  I think it was a .40.

18      MR. WOOD:  It was, Your Honor.

19      MR. MILES:  I believe it's 47 and 48, Your Honor.

20      THE COURT:  Right.  You see, the language here in her

21  testimony on page 48, lines 14 through 16, she says, "When he

22  went up to either come off the porch or jump up which at that

23  time the officer had to make a decision and, yes, I heard a

24  gunshot."  Doesn't that suggest that the movement came before

25  the shot?

1          MR. MILES:  I think that it would be fair to conclude

2     that, Your Honor.  If you read on down at the end of the page

3     the question was asked, "Was he up in the air when he was shot?

4          "Sir, I would not able to determine that.  I know that

5     he jumped and he was shot and he fell."

6          THE COURT:  Okay.  Go ahead.

7          MR. MILES:  The point being, Your Honor, at that

8     moment Mr. Samuel was not making any aggressive, taking an

9     aggressive action towards Officer Garrett at that time in

10    either lunging at him, running towards him, slashing the knife

11    at him or anything else, which would create an imminent threat

12    of danger to Officer Garrett at the time.

13         We've discussed earlier the distance and the

14    investigation of the Broken Arrow Police Defendant indicated

15    that it was 27 feet, 11 and 3/8th inches.  We've got testimony

16    of Diana Lance who said Officer Garrett was in the yard; we've

17    got testimony from Jimmy Franklin that said Garrett was in the

18    yard; testimony of Ruth Samuel that says Garrett was in the

19    yard; and Officer Garrett testified that from the time he drew

20    his weapon he never moved.  So we believe there certainly is a

21    question of fact as to the location of where Officer Garrett

22    was, assuming Officer Garrett takes the position he was 10 to

23    15 feet away from him.

24         THE COURT:  Well, I understand that.  I don't know

25    that he even says that.  He says he perceived he was 10 or 15

1    feet.

2            MR. MILES:  Yes.

3            THE COURT:  But as I say, I don't know that I can

4    consider that for purposes of summary judgment here.  There's

5    no question that he was in the yard; right?

6            MR. MILES:  That's correct.

7            THE COURT:  Everyone says he was in the yard.

8            MR. MILES:  That's correct.

9            THE COURT:  And your understanding, he was essentially

10   straightaway from the front door?

11           MR. MILES:  Correct.

12           THE COURT:  Right.

13           MR. MILES:  Correct.  Your Honor, we believe that a

14   reasonable officer under those conditions would not have made

15   that decision to execute lethal force at that point in time

16   under these facts.

17           THE COURT:  All right, given that there's no bright

18   line here, the Tenth Circuit has said, how am I to consider the

19   21-foot rule?  I'm told by the folks that grade my papers I

20   can't consider that as a bright line.  I'm to consider the

21   totality of the circumstances; correct?

22           MR. MILES:  And I think that is one of the factors

23   that the Court certainly can consider, the distance between the

24   suspect and the defendant in this case.  And the fact that

25   there was no warning given to Mr. Samuel that he was to be shot

1    if he did not drop the knife, I think is clearly a violation of

2    the law.  It's undisputed that Officer Garrett gave no warning

3    to Mr. Samuel that he was to be shot.

4        THE COURT:  All right.  Given that two warnings were

5    given to drop the knife and the weapon was directed at Mr.

6    Samuel, do you think it is a constitutional violation per se if

7    no warning is given?

8        MR. MILES:  I think the law requires that some warning

9    be given if feasible, and I think that the order -- I would

10   argue that it's a command to drop the knife -- doesn't

11   necessarily give Samuel fair warning that he is subject to

12   being shot if he didn't do that under those circumstances.

13       The other question, Your Honor, I think the Court

14   should consider is that you have to look at the circumstances

15   that existed at the time Officer Garrett arrived.  At the time

16   Officer Garrett arrived he did not know that Ruth Samuel

17   allegedly had been strangled as asserted by the defendant in

18   their motion.  The testimony from Officer Garrett was that when

19   he arrived he approached Ruth Samuel and she told him

20   everything was okay.

21       THE COURT:  Well, right, but that's why I asked what

22   he knew.  Do you contest that he was told that a man was

23   physically assaulting his wife and beating her up -- or beating

24   her up and that it was in progress?

25       MR. MILES:  I don't dispute that.  It was a domestic

1   violence call that came in over the radio.  But I think it's

2   also important to note at the time that he exited his vehicle

3   he took his Taser with him, grabbed it from the inside the car.

4   He had that available to him at the time.

5        THE COURT:  A Taser is not very effective against a

6   knife though, is it?

7        MR. MILES:  Well, I suppose it depends upon at what

8   distance.  I don't --

9        THE COURT:  No, I guess I'm thinking in terms of the

10  electrode, dual electrode, they have to be in contact.  You're

11  talking about a Taser that shoots?

12       MR. MILES:  Shoots.

13       THE COURT:  With the wire attached to it?

14       MR. MILES:  Yes, sir.

15       THE COURT:  All right.  I don't even know, what is the

16  range on one of those things, do you happen to know?

17       MR. MILES:  From what -- and I don't think this is in

18  our record, but from I understand it's less than 20 feet to be

19  effective as far as being able to shoot and hit someone.  And

20  we would argue it's not effective at 27 feet.  But obviously he

21  had his service weapon drawn and -- at the time Mr. Samuel

22  exited the residence.  We believe that Officer Garrett had

23  ample time to consider what he was doing before he pulled the

24  trigger.  He had his weapon drawn on Samuel when he stepped out

25  of the house and took two step forward and made a conscious

decision not to shoot him then. And he took one more step
forward and he made a conscious decision not to shoot him then.
It was only when he started to take another step that Mr.
Samuel was shot. And all the while, Mr. Samuel was still on
his own front porch, he never left his porch. So we believe
that the facts taken in the light taken most favorable to the
plaintiff, arguably a constitutional violation exists.

And with regard to the issue of qualified immunity,
Your Honor, we do believe that the Tenth Circuit, there was
existing caselaw in the Tenth Circuit at the time that would
support the notice on the part of Officer Garrett. Obviously
the Murr case discussed the same type of situation. There's
also --

THE COURT: Which case, I'm sorry?

MR. MILES: The Larsen vs. Murr case.

THE COURT: Oh, right. Got it.

MR. MILES: There was also the case of Walker vs. City
of Orem, O-R-E-M that's cited in our brief, Your Honor, that
specifically states that it was specifically established that
where an officer had reason to believe that a suspect was only
holding a knife, not a gun, and the suspect was not charging
the officer and had made no slicing or stabbing motions towards
him, that it was unreasonable for the officer to use deadly
force against the suspect. And that's was citing a case called
Zuchel vs. City and County of Denver.

1     THE COURT:  Yes, I've got that.  That was a Layn

2  Phillips case.

3     MR. MILES:  Yes, sir.  So for those reasons, Your

4  Honor, we would request that the motion for summary judgment of

5  Officer Garrett be denied.

6     THE COURT:  Thank you very much.  Mr. Wood.

7     MR. WOOD:  Just briefly, Your Honor.  As we point out

8  in our reply brief, the Walker vs. Orem case is materially

9  different factually and we don't think that it could be

10  presumed to have put defendant Garrett on notice that his

11  actions would be considered a violation of Mr. Samuel's

12  constitutional rights.  In Walker they were responding to a

13  call involving an individual who posed a danger, first of all,

14  only to himself.  He had not made any threats, not done any

15  violence to anyone, including himself.  He was only in the

16  possession of a two-inch box knife that he was holding to his

17  own wrist.  I'm trying to think when the Orem case was decided.

18     THE COURT:  2006.

19     MR. WOOD:  Okay.  A two-inch box knife to me, or you

20  might ask any of those people that were on the airplanes on

21  9/11 if a two inch box knife can be considered a deadly weapon.

22  There was only one group of people that had enough stones to

23  take them on under those circumstances.  So we think it's

24  factually very different from the case that we have at bar and

25  quite different from the Estate of Larsen.

1        I think we cleared up the discussion about whether he

2   jumped or not.  That's Hollywood myth stuff that someone is

3   going to jump if you are shot with a .40 caliber handgun.

4   Officer Garrett's testimony was that he dropped straight to the

5   ground.  One plausible explanation of how Mrs. Lance saw things

6   and how Officer Garrett saw things, is Officer Garrett was

7   looking down the sights of a gun pointed at center mass.  Mrs.

8   Lance was across the street and had a much wider view.  What

9   she describes is consistent with Officer Garrett in this way.

10  Officer Garrett said he saw a foot come up to start to step

11  towards him.  If someone had decided to charge, one of the

12  first things they are going do is maybe start off or get a good

13  traction or start forward in a rapid manner.  What she

14  describes is consistent with that.  But either in combination

15  or taken separately that is a furtive movement with someone who

16  has refused to drop a deadly weapon and Officer Garrett was

17  entitled to use deadly force to protect himself and Mrs.

18  Samuel.

19        THE COURT:  Thank you, Mr. Wood.  Ms. Wilkening.  It's

20  a pleasure to have all of you as lawyers who actually try cases

21  in state court as opposed to all of these highfalutin lawyers

22  who do nothing but federal work.  I've got some folks who

23  understand the real world here for a change.  Go ahead.

24        MS. WILKENING:  May it please the Court, I'm going to

25  do my very best not to rehash everything that has already been

said particularly with regard to the constitutional violations, but if Court will indulge me there are a couple of points that I would like start out with refuting before I frankly forget what they are.

One of the things that I want to talk just briefly about is the issue regarding lack of warning. And I think it's pretty important that the Court recognize the fact that there is no requirement in the law that a warning be issued prior to an officer utilizing deadly force. The deadly force policy of the Broken Arrow Police Department, it specifically provides that where feasible a verbal warning shall be given to the offender prior to the use of deadly force. In this particular case I believe that it should have been fairly clear to Mr. Samuel, as he had a loaded gun pointed at him with the officer saying "drop the knife, drop the knife," that the use of deadly force was a very real possibility. But more importantly the case of Thompson vs. Salt Lake City which is a Tenth Circuit case that came down in 2009, it specifically provided that a warning by police officers is not required under the Fourth Amendment reasonableness standard. Now in this particular case, and I think that all of the research tends to support this allegation, is that when you're dealing with an individual that has a knife or a gun or something to that effect, it's very important for the officer to give short, very specific commands. And in this particular case that's what transpired.

The other thing, and I know we've kind of beaten the 21-foot rule to death here, but I would really like an opportunity to respond from the City of Broken Arrow's standpoint.  The research consistently shows that 21 feet is the distance that an individual with an edged weapon can advance on an officer and attack him before the officer can recognize the threat, determine his course of action and implement that action.  And we performed -- and I don't mean to be trite by bringing this up, but I think it's kinds of an important observation, particularly in lieu the Estate of Larsen case.  I performed kind of an unscientific test in my own home.  I gave my husband a glue gun.  I put on a pair of flip flops and grabbed a pen, backed away by 21 feet, and when he said go, I ran.  He concluded that he shot me and I concluded his intestines were laying on the ground.  Mainly what happened was he the got ink on his shirt.

But I think what the court was trying to say in the Estate of Larsen case is we're not going to establish a bright line rule with regard to the distance.  And I think that that was well thought out by the court because you don't want an officer, as mentioned by Mr. Wood in this particular case, when you're dealing with a very compressed time frame of 60 to 90 seconds, you don't want the police officer to say, oh, wait just a minute, are you 21 feet from me or 27 feet from me?  I think as the court has indicated numerous times, you have to

1   consider the totality of the circumstances.  And something else

2   that I think that's pretty important in this particular case is

3   the fact that you had the plaintiff, Mrs. Samuel, and the

4   neighbor located in very close proximity to where Mr. Samuel

5   was standing with a knife and he certainly, if they were

6   standing, as they have testified they were in front of the

7   garage, he certainly could have closed the distance between to

8   them fairly quickly.

9         If you go back and you look at the City of Broken

10   Arrow's or the police department's policy with regard to the

11   use of deadly force, the police officers have the ability to

12   use deadly force if they believe that their lives or the lives

13   of someone else are at great risk.  And that was something I

14   think that maybe was just slightly overlooked in the previous

15   argument, and that's the fact that he very quickly and very

16   easily could have gotten to either one of those individuals and

17   caused some significant harm to them.  Just for purposes of

18   mentioning it, the 27 feet that was identified during the

19   course of the investigation, that wasn't necessarily an

20   identification of the exact location of where the officer was

21   standing.  There are many factors that play into it.  It was

22   simply an estimate, Your Honor.  I certainly can embrace the

23   Court's perspective that, you know, that was approximately

24   where it is, but when you examine the totality of the

25   circumstances with regard to this particular case, the location

of the witnesses, his failure to respond to the lawful command,

by the fact that he had already exercised harm on someone else,

and although not known to the officer in advance of this, his

state of mind at that time, as he told Mr. Franklin was -- or

as Mr. Franklin overheard him say, if the cops come, I'm going

to get a knife and make them shoot me.

THE COURT:  Of course I can't consider that for our

purposes today; correct?

MS. WILKENING:  I understand.  Really the landmark

issue or the landmark case with regard to these types of

actions against cities is <u>Monnell vs. The New York City</u>

<u>Department of Social Services</u>.  And in that particular case the

United States Supreme Court said we are going to adopt a

two-pronged test with regard to application of 1983 liability.

The first prong of that test is a demonstration that the

employee committed a constitutional violation.  Now rather than

go back and rehash all of the facts that have previously been

set forth, I think it's clear under the totality of the

circumstances that there was in fact no constitutional

violation.

The second prong of the test is that a municipal

policy or custom was the moving force behind the constitutional

violation.  Now in this particular case the plaintiff has not

demonstrated any flawed police department policy, procedure or

claim.  You know, it was kind of interesting going through this

1   briefing process because typically that's what plaintiffs and

2   their attorneys really seem to focus on is application or

3   allegation with regard to the policy issue.  And that really

4   wasn't set forth.  I mean, the expert retained by the

5   plaintiffs never came out and said, you know, I find that the

6   policy, the deadly force policy is unconstitutional, and they

7   couldn't because it wasn't.  If you go back, the genesis of

8   that policy, and probably of every deadly force policy

9   throughout the United States was the Tennessee vs. Garner.  And

10  the Broken Arrow Police Department continually updated that

11  policy and in accordance with the evolution of the court cases.

12          You know, and as set out in Carr vs. Castle, you know,

13  I think it even takes it a step further with regard to this

14  Monnell standard.  Officers may use deadly force when a suspect

15  threatens an officer with a weapon, which happened in this

16  particular case, or there's probable cause that the suspect has

17  committed a crime involving the infliction or threatened

18  infliction of serious physical harm.  Now clearly in this

19  particular case Officer Garrett was aware that there had been

20  harm inflicted.

21          Now, I would like to take just a minute and talk about

22  the failure to train claim.  You know, importantly, a city can

23  only be held liable on a failure to train theory if the failure

24  to train amounts to deliberate indifference to the

25  constitutional rights of the person with whom the police come

into contact with. Now, if you back that up just a little bit and you look at the materials that were submitted with the City's motion for summary judgment, Officer Garrett was well trained. He was trained in accordance with constitutional provisions. You know, he went through a CLEET academy as required by the state. He came back, he went through an extensive FTO training procedure and he received constant training and updating by way of the Broken Arrow Police Department.

Now in this particular case the plaintiff can't point to any flaw in the training, let alone deliberate indifference. Now, they tried to point out a few things. Interestingly enough, the things that were pointed out by the plaintiff's expert didn't really hit on the issue of policy or custom, they really went more to training. And if you look, and you really have to kind of wash it out and flesh it out to try to figure out exactly what he was saying, but very -- in its most basic form what their expert was saying was that he should have waited in the car, he shouldn't have gotten out and approached Ms. Samuel until the backer arrived. Well, there are a couple of problems with that. I mean, I think that that probably does, if in fact that does happen in other jurisdictions -- I can't imagine that it does -- but the first problem is you make a target of yourself. You know, Mr. Samuel was on a mission. He kicked the door in, he went in, he got a knife. What if he

had gotten a gun? The officer would basically be making a target of himself by remaining in the vehicle. Second of all, I think that the taxpayers of the City Broken Arrow and other municipalities in the state of Oklahoma, I think that they have expectation that when an officer arrives, if there is a victim that has been physically assaulted, that they will exit their vehicle and go and find out what transpired, do they need medical attention, is there a risk they're going to return with a weapon, is the situation going to be escalated, that type of thing. There was no violation of policy because there was a backer assigned. Officer Garrett was the backer, he just happened to get there first, there was another officer on the way.

The third allegation that I was able to pick up from the plaintiff's expert's report was that Officer Garrett, that he actually escalated the situation because he didn't take cover behind his patrol vehicle when Mr. Samuel exited with a knife. And then we pressed on that issue with regard to the close proximity of Mrs. Samuel and Mr. Franklin, I mean the conclusions were simply that he should have yelled to them, "Okay, go take cover." And that's just nonsensical, Your Honor. He was, Mr. Samuel was in very close proximity to the plaintiff and also to Mrs. Franklin {sic}. I think that the taxpayers have an expectation if officer is there and responding that he shouldn't just save his own hide by running

behind a police car and then yelling to bystanders, "Okay, go run to Mr. Franklin's house."  In that particular case his use of force was reasonable and it was necessary to disarm the threat.

In this particular case I think the Court has to examine, and we brought it up in both of our briefs, the <u>Carr vs. Castle</u> case.  It identifies four factors to be established in addition to proving that the training was inadequate.  Now, I won't bore the Court with going through those.  It's simply our assertion that they are wholly inapplicable in this particular case.  However, what is important is the one aspect of that that requires deliberate indifference.  And in this particular case there was no indication that the Broken Arrow Police Department acted with deliberate indifference to Mr. Samuel or anybody else.

Now I think it was the <u>Zuchel</u> case, if you go back and look at it, and the Tenth Circuit said, okay, there are going to be times when we will find that law enforcement agencies, a/k/a cities, have acted with deliberate indifference.  And as examples of that they provided a situation, I think it may have even been it is City of Denver Police Department where the D.A.'s office had repeatedly notified the police department, you continue to use excessive force, your policies aren't consistent with constitutional law and you're failing to train your officers.  That was simply not the case here.  I think

that there are two very important distinguishing factors.
Number one, in the five years preceding this incident the City
of Broken Arrow had had several excessive force type cases
reviewed by the district attorney's office. Now that's done in
accordance with our policy. In each of those cases -- now, of
course, as the Court knows, the City of Broken Arrow is lucky
enough to straddle two different counties, so we've got Wagoner
County and Tulsa County. So in some ways you've got somewhat
of an increased scrutiny because you've got two different
district attorneys' offices reviewing these types of cases.
And in all of those cases the district attorney found that the
use of force was not -- it was not criminal and that there
wasn't any sort of improper use of force.

Now taking this to its logical conclusion is, as an
organization, they didn't have a problem with acting with
deliberate indifference to anybody else. You know, let's look
at the officer individually. If this had been a situation
where this particular officer, Officer Garrett, was repeatedly
being he investigated, whether it was substantiated or not, for
claims of excessive force or deliberately mistreating
individuals or, you know, if he had been disciplined for it,
any of those sorts of things, I think this would be a different
case. But that's simply not the case. We've provided through
the course of discovery a memorandum from the Internal Affairs
Division that indicated that he had had a couple of complaints,

complaints generated internal to the police department and external that came in. The only one that was substantiated was a claim of the hideous offense of rudeness. And if memory serves, it was because he told someone that their house was dirty. Well, I will have to keep him out of my house for sure, because I'm quite certain that my house would rise to the level of dirty. However, him commenting on the cleanliness of my house wouldn't necessarily make me afraid that he was going to then beat me up.

So in this particular case I think -- well, I believe that the plaintiff can't substantiate a claim of failure to train.

Finally, let's talk just a little about the tort violations because in the City of Broken Arrow we are lucky enough to be able to have numerous claims filed against us no matter what the situation typically. In this particular case it's a little bit different because the plaintiff, unlike the typical shotgun approach of, okay, you were negligent and then the City gets to try to figure out how. In this particular case the plaintiff specifically pled that the City was negligent in the training, supervision and retention of Officer Garrett. Well, I think the training allegations is out the window for all of the reasons that we've set forth in our brief and have previously been discussed. However, to survive summary judgment with regard to the tort claim, the state court

1    claim actions, the plaintiff must show that the City was

2    negligent in the supervision or retention of Officer Garrett,

3    and they simply can't do this. As previously mentioned, there

4    is no disciplinary history to indicate problems, there's no

5    department history whatsoever to indicate any problems. And

6    under established law the plaintiff would have to show that the

7    City had reason to believe that Officer Garrett would create

8    undue risk of harm to others, and there's just simply no

9    evidence to that effect.

10         If you couple that with the exceptions to liability

11    under the Tort Claims Act -- I really hate to go through those

12    because they are long and everybody is probably tired and ready

13    to be done with this -- but I mean there are a number of

14    exceptions that the City would be entitled to, not the least of

15    which would be with regard to acting within the recognized

16    standards which we believe that actually occurred in this case.

17         Finally, you know, the Estate of Larsen case is, I

18    believe, Your Honor, really dispositive with regard to this.

19    And you know, whenever I try a criminal case or argue a case in

20    civil court, state or federal, I guess I always sort of look to

21    the scales of justice, you know, Lady Justice. And you know,

22    if you do that in this particular case, and you start out with

23    all those things that were examined by the Tenth Circuit in the

24    Larsen case, they are just heavily, heavily applicable here.

25    Larsen had already threatened violence. We know that that

1   certainly had occurred in this particular case. Not only had

2   Mr. Samuel threatened violence he had effectuated violence.

3   The officers responded to an emergency call late at night.

4   That happened in this particular case. When officers arrived

5   they encountered a man with a knife. Well, Officer Garrett got

6   there, but shortly, very, very shortly thereafter he came out

7   with a knife. The officers told Mr. Larsen to put down the

8   knife. Mr. Samuel was told twice, "Drop the knife. Drop the

9   knife." Larsen refused to he is drop the knife. Mr. Samuel

10  refused to drop the knife. Larsen raised the knife above his

11  shoulders and pointed the tip towards the others. It's

12  factually, Your Honor, very, very similar. He was prepared to

13  use force and was moving in a position to be able to do so.

14  You know, he began to take that fateful step forward. You

15  know, if you take Ms. Lance's perspective from that, he jumped.

16  But in any event the officer, I think, who was entitled -- you

17  know, the standard is reasonableness and I think it was

18  reasonable in this particular case for him to conclude that Mr.

19  Samuel was moving towards him. And he was on the porch, just

20  like he was in the instant situation.

21          So thank you, Your Honor, for agreeing to hear oral

22  argument on this case. We would respectfully request that the

23  Court grant motion for summary judgment in the City's favor.

24          Thank you.

25          THE COURT: All right, I'm going to ask about the

pendent negligence claim and you made reference to it.  Now, I
had read just personally, in looking at the petition here,
training, supervision and retention as part of the Section 1983
claim, but you're reading that as part of a pendent state tort
claim?

MS. WILKENING:  Well, I think -- we're about to test
how good my memory is, but in this particular case I don't know
that there is any 1983 federal type cases that contemplate --
that contemplate supervision or retention claims because that
is falls under, I believe, under the category of respondeat
superior which the United States Supreme Court has been very
clear you cannot have a claim of respondeat superior under a
1983 action.  Now the training, I think, could be considered
under both, so that was why I addressed it under both the
negligence standard from the state tort claims perspective as
well as with the federal law.  But I think I addressed that in
my original motion for summary judgment.  It's my belief that
there isn't any available remedy for supervision or retention
under federal law.  But nonetheless, even if my reading of the
law is incorrect, they would still have to demonstrate
deliberate indifference which is a threshold that I do not
believe can be met.

THE COURT:  All right, even under state law?

MS. WILKENING:  I don't think that a deliberate
indifference standard would apply to the state law.

1          THE COURT:  Correct.

2          MS. WILKENING:  I guess I'm taking it with regard to

3     the federal case.

4          THE COURT:  I see.  I see.  So with regard to this

5     respondeat superior issue, talk to me about that.

6          MS. WILKENING:  Okay.  This is one of my favorite

7     things to explore because in some ways it's what came first,

8     the chicken or the egg, but if you take it strictly from a

9     state law perspective, if an officer is acting outside -- and

10    that's any officer, any employer officer acting outside the

11    scope and course of their employment, then the city itself

12    cannot be liable.  Now of course, that's not what we're saying

13    here in this particular situation.  We're saying that he did

14    everything proper.  And so as such, Officer Garrett is not a

15    proper defendant, the City of Broken Arrow would, of course, be

16    a proper defendant.  But what I'm saying is because of the

17    exemptions set forth in the Tort Claims Act as identified in

18    the briefing process with regard to acting within reasonable

19    standards, law enforcement actions and activities, those types

20    of things, is the City of Broken Arrow would be exempt even

21    under the state tort law type claims for the three issues that

22    they've raised.

23         THE COURT:  Okay.  So your primary defense then under

24    state law is the tort act, Governmental Tort Claims Act

25    exemption.

1          MS. WILKENING:  It is, but also, I mean, if you go

2     back and, I think, look at that Presbyterian vs. Thompson case

3     it talks a little bit about retention and supervision and I

4     think that if memory serves, the court actually -- and if

5     you'll give me just a second I can find it -- but it talks

6     about how the city or the -- and I use the city and the police

7     department interchangeably, but the city has to be on notice

8     that there's actually a problem in order for liability, even

9     under a tort concept, to attach.

10          It's right here, Your Honor.  In order to survive

11    summary judgment on a claim for a negligent supervision and

12    retention, plaintiff must show a genuine issue of material fact

13    exists as to whether the officer engaged in a wrongful act that

14    injured someone and that the defendant town was negligent in

15    supervising or retaining the officer.  And that was Rollins --

16          THE COURT:  What page of Presbyterian is that on?

17          MS. WILKENING:  I'm sorry?

18          THE COURT:  You say -- are you reading that from

19    Presbyterian?

20          MS. WILKENING:  No, sir, that's Rollins vs. Town of

21    Haskell.

22          THE COURT:  Rollins.

23          MS. WILKENING:  And it's on page 9 of my reply brief,

24    Your Honor.  And the Presbyterian case, it's the Presbyterian

25    Church, it talks about negligent retention based upon an

1   employee's harm to a third party through employment.

2            THE COURT:  Right.

3            MS. WILKENING:  And goes on to say, you know, they

4   have to be on notice.

5            THE COURT:  Well, you're not going to be, as you say,

6   you're not going to be liable for negligent retention unless

7   you are on notice of some problem.

8            MS. WILKENING:  Yes, sir.

9            THE COURT:  Okay.  Anything else?

10           MS. WILKENING:  No, sir.

11           THE COURT:  Thank you.

12           MS. WILKENING:  Thank you.

13           THE COURT:  Mr. Miles.

14           MR. MILES:  Yes, Your Honor, thank you.

15           Your Honor, I believe in our brief we did set forth

16  specific factual issues regarding the lack of training or

17  improper training that Officer Garrett had in responding to

18  this situation.  I believe it was Sergeant Martin, who was

19  responsible for the training of Officer Garrett with regard to

20  the use of deadly force, testified that Garrett was trained to

21  shoot at 10 yards if he was confronted with a edged weapon, or

22  30 feet.  That's what he said.  He also -- and I believe it was

23  Captain Arning who testified that there was no requirement to

24  warn Samuel that he would be shot or killed, and Arning as well

25  was responsible for the training of Officer Garrett.

1          There is a substantial amount of time spent by Roger

2     Clark, an expert that was retained on behalf the plaintiff,

3     that talked about, who talked about how to respond to a

4     domestic violence call like this and that it was a two-person,

5     two-officer call.  And in fact, Officer Garrett was the backing

6     officer on this call, Officer Hunsberger was the officer that

7     initially received the call and Garrett just arrived there

8     sooner than him.

9          One of the other issues with regard to the liability

10    of the City is the fact that they lacked any, any policy on the

11    use of medications by an officer on duty.  And this really

12    wasn't addressed the in the prior argument with regard to

13    Officer Garrett, but the plaintiff alleges that Officer Garrett

14    was taking a prescribed medication at the time of this shooting

15    which affected his judgment.  And in the materials that's set

16    forth, there's testimony from his treating physician who

17    described the medication, its effects and when it was

18    prescribed by Officer Garrett.

19          THE COURT:  All right, in that regard, first of all,

20    certainly your expert witness can't testify as to the law, that

21    it's a violation of constitutional rights not to have a policy

22    with regard to use of medications.  But I guess, number one,

23    any evidence of problems in the City of Broken Arrow with that;

24    and number two, any caselaw for the proposition that it's a

25    violation, a constitutional violation not to have a policy

1    specifically addressing the use of medications by police

2    officers?

3           MR. MILES:  I've not been able to find any specific

4    caselaw, Your Honor.  With regard to problems within their

5    particular department, we've not been able to develop any

6    evidence of that, but to the extent that that's an issue, also,

7    that you have to look at in the totality of the circumstances

8    and in viewing the constitutionality of the action taken by

9    Officer Garrett, you have to look at it from a reasonable

10   officer's perspective and is it reasonable for an officer to be

11   using a medication that could affect his judgment using a

12   dangerous weapon under those circumstances?  And we allege that

13   the lack of policy in that regard is -- imposes liability on

14   the part of the City.

15          I would like to address, also, the one case that Ms.

16   Wilkening mentioned, Thompson vs. Salt Lake City which she

17   indicated that a warning is not required for the use of deadly

18   force.  And I submit that is not what the case said.  That case

19   involved a factual situation where a police officer had let a

20   police dog loose on an individual and subsequently the

21   individual was shot.  And it's at page 29 of the opinion.  The

22   Court said a warning is not invariably required even before the

23   use of deadly force, let alone here where the release of a dog

24   nondeadly force used in the face of an imminent threat.  And it

25   goes on to cite the Garner case where the Garner case said that

1   a warning was required where feasible.  We submit in this case,

2   Your Honor, certainly Officer Garrett had sufficient time to

3   issue a warning from the time Samuel stepped out through the

4   threshold of the door, when he stopped, when he took two more,

5   two steps and stopped, he could have been warned the at that

6   time; when he took another step and stopped, he could have been

7   warned at that time.  So I don't believe that the Thompson case

8   does away with the requirement of providing a warning.

9        With regard to the Governmental Tort Claim that we

10  submitted, we believe, Your Honor, that we have alleged that

11  Officer Garrett, in the petition was negligent, and as a result

12  of that the City is responsible under the theory of respondeat

13  superior.  I don't believe that there is an exemption for the

14  City under those circumstances.  And there is also a state case

15  that addresses that issue and it's Morales vs. City Oklahoma

16  City 210, OK 9, 230 P.3d 869.

17       THE COURT:  That citation doesn't make sense.  210 --

18  oh, 210 P.3d.

19       MR. MILES:  No, 210 Oklahoma 9.  That's the Oklahoma

20  citation.  The West cite is --

21       THE COURT:  That doesn't make any sense.  Maybe 2010?

22       MR. MILES:  2010, yes sir.  What did I say?

23       THE COURT:  You said 210.

24       MR. MILES:  I'm sorry.  Excuse me, Your Honor.

25       THE COURT:  Okay.  2010 Oklahoma 9.  And what's the

1  Pacific Reporter cite?

2          MR. MILES:  230 P.3d 869.

3          THE COURT:  Okay.  And what does Morales say?

4          MR. MILES:  Under that case, Your Honor, the court

5  discussed a situation where there was a tort claim filed as a

6  result of an arrest and the court found in that case that the

7  Governmental Tort Claim, the exemption did not apply because

8  the plaintiff in that case, their claim was for the negligent

9  performance of the function of carrying out an arrest, as

10  opposed to a providing protective services.  And I think the

11  exemption that was discussed there, and I think this is the

12  same exemption that the City of Broken Arrow cites at Section

13  155, paragraph 6.  Under those circumstances the Governmental

14  Tort Claim exemption would not apply in our case.

15          THE COURT:  Okay.  But does that go to application of

16  the exemption or the respondeat superior liability?

17          MR. MILES:  That would be the application of the

18  exemption and....

19          THE COURT:  Okay.  Everybody agrees here, you agree,

20  she agrees that the officer was acting within the scope of his

21  duties; correct?

22          MR. MILES:  I believe that's correct, Your Honor.

23          THE COURT:  All right.  So as I understand it, Ms.

24  Wilkening is arguing as a defense to the state tort claims

25  Governmental Tort Claims Act exemptions exclusively; correct?

1          MR. MILES:  That's what I understand.  And as I

2    understood there was a specific reference to paragraph 6 of the

3    act.

4          THE COURT:  Of 155 sub 6?

5          MR. MILES:  Yes, sir.

6          THE COURT:  All right, so that's what we need to deal

7    with.  All right, and you say <u>Morales</u> goes to that, in your

8    opinion?

9          MR. MILES:  Yes, sir.

10         THE COURT:  All right, any other cases?

11         MR. MILES:  That's all, Your Honor.

12         THE COURT:  Okay.  Thank you.  Ms. Wilkening.

13         MS. WILKENING:  If the Court please, I guess I

14    misspoke previously.

15         THE COURT:  No, you may not have.  Are you talking

16    about the Governmental Tort Claims Act, the respondeat

17    superior?

18         MS. WILKENING:  Yes.

19         THE COURT:  Yes, I was going to say, if I've

20    misrepresented your position, let me know.

21         MS. WILKENING:  Well, the only thing that I would say

22    with regard to that is I'm really not arguing the exemption

23    solely.  That wasn't my intent.

24         THE COURT:  All right.  So other than the exemptions,

25    what else are you arguing?

1   MS. WILKENING:  If you go back to very basic tort law

2   and you look at, you know, duty, breach the duty, you know,

3   meeting the elements, that's why I broke my brief down the way

4   it did.  The exemptions, I don't want to say that they're an

5   afterthought, but if you go back and you take a look at the

6   caselaw that I have cited in there with regard -- well, let me

7   back up just a little bit, if I could.  Okay.  If you go back

8   and look at the plaintiff's petition in its purest form.  Okay.

9   You know, what they are alleging is negligent supervision,

10  retention and training.  It's my position that through my brief

11  on the exemptions notwithstanding, that I have demonstrated

12  their failure to make a claim.

13          THE COURT:  Under respondeat superior.

14          MS. WILKENING:  Well, or under just pure tort law.  I

15  don't think that they can demonstrate meet the elements under

16  pure tort law with regard to those elements, because if you

17  look at the caselaw, I mean, it's pretty clear in there that

18  the courts have said in this regard, in order to have an

19  actionable claim under a negligence standard you have to

20  demonstrate, you know, essentially that the city had to be on

21  notice that there was some sort of problem.  It's sort of like

22  a pothole.  As the Court well knows, a city can't be held

23  responsible for a pothole unless it's been placed on notice

24  that there's an issue.  So it's not just the exemptions that

25  are important here.

1          THE COURT:  Got it.  It's like a slip and fall case,

2    the invitor has got to have notice, typically, of the

3    condition.

4          MS. WILKENING:  Right.  Especially with regard to the

5    supervision and retention.

6          THE COURT:  And I didn't realize that was one of your

7    arguments.

8          MS. WILKENING:  Yes.

9          THE COURT:  All right.

10          MS. WILKENING:  Well, apparently I didn't put that out

11    very well, but that was certainly my intent.  And then, of

12    course, with regard to the training issue, it's out position

13    that they haven't offered any evidence which would assist them

14    in overcoming the City's motion for summary judgment because of

15    the all of the materials and the affidavits and the things like

16    that that were set forth and touched in the City's motion.

17          Very briefly, he does talk a little bit about 10-foot

18    rule.  I think that he's -- or the 10 foot, the allegation it

19    would be appropriate shoot someone if they were 10 feet away.

20    That actually came out in the deposition, Sergeant Glenn

21    Langley, who was the range master.  And I think that what he

22    said throughout his testimony -- I actually brought this up in

23    the reply brief -- is that it's the totality of the

24    circumstances that are important, not just the distance.  And

25    so that lends credibility to the fact that the City's training

1    programs, policies, procedures, that type of thing actually

2    were in compliance with the law of the Tenth Circuit.

3         Let's talk very, very briefly with regard to this

4    whole drug and alcohol policy.  I mean the City does have a

5    policy.  Our employees, you know, may not have every single one

6    of those policies, you know, committed, and depending on the

7    way the question was asked, but the City does have a policy

8    preventing its employees from showing up to work in a state of

9    intoxication or being under the influence, and I believe that

10   that was provide throughout the briefing process.  And so it

11   was obvious, and again this is set forth in the affidavits in

12   response to -- in reply to his response to our brief that if

13   the police officers have suspected that Officer Garrett was

14   under the influence of something they would have had an

15   obligation to document that, they would have had an obligation

16   to have him tested.  But if you look at the Oklahoma Workplace

17   Drug Testing Act -- and there's been some changes in the law

18   since this actually transpired -- but the City of Broken Arrow,

19   the Police Department would have no reason to and actually

20   couldn't say, okay, you need to go be drug tested in this

21   particular situation absent some observation and documentation

22   that he was under the influence.  So...

23        And Mr. Wood asked me to bring to your attention,

24   because you asked about the Estate of Larsen case with regard

25   to the 21-foot rule.  There's note in one of the footnotes that

1    Denver's use of force policy training manual instructs that

2    knife welding persons within 21 feet pose an imminent threat to

3    officers based on the time in which a distance can be closed in

4    an attack.  And so the 21-foot rule was discussed by the court,

5    albeit in a footnote.

6              THE COURT:  Right.

7              MS. WILKENING:  With regard to Morales vs. City of

8    Oklahoma City, I think that you will find, the Court will find

9    that if you go into any exhaustive review of Oklahoma Supreme

10   Court cases addressing the various exemptions, sometimes it's

11   difficult to predict what the court will do in any given set of

12   circumstances, but it is, of course, our position in this that

13   the plaintiff has not met the initial burden of being able to

14   meet all of the elements in these three causes of action, and

15   additionally that the exemptions would apply.  Thank you.

16             THE COURT:  Thank you very much.  If there's nothing

17   further we are adjourned.

18             (Court adjourned.)

19

20             A TRUE AND CORRECT TRANSCRIPT.

21

22             CERTIFIED:   s/ Glen R. Dorrough
                            Glen R. Dorrough
23                          United States Court Reporter (retired)

24

25